294 N.J. Super. 519 (1994)
683 A.2d 862
RICHARD MCGUINNESS, PLAINTIFFS,
v.
TIMOTHY L. BARNES, ESQ. ATTORNEY AT LAW OF THE STATE OF NEW JERSEY, WILLIAM O. BARNES, JR., ESQ., ATTORNEY AT LAW OF THE STATE OF NEW JERSEY AND BARNES & BARNES, ATTORNEYS AT LAW OF THE STATE OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Law Division (Civil) Union County.
Decided November 16, 1994.
*520 Hilton L. Stein for plaintiff.
Patrick M. Callahan for defendant (Tompkins, McGuire & Wachenfeld, attorneys).
*521 Joshua P. Cohen, amicus curiae on behalf of "Institute of Continuing Legal Education" (Cohn Lifland Pearlman Herrmann & Knopf, attorneys).
MENZA, J.S.C.
This is a legal malpractice case.
Defendant moves to bar plaintiff's use at trial of defendant's comments made while he was a panelist at a legal seminar.
The question presented is whether an attorney's out of court statements made at a legal seminar can be used against him in the trial of a legal malpractice case.
Plaintiff has brought suit against the defendant for legal malpractice based on his failure to pursue a medical malpractice claim which resulted in the running of the statute of limitations. Plaintiff contends that the defendant failed to obtain certain hospital records, failed to obtain an expert witness and failed to procure New York counsel to institute an action in the New York courts.
Subsequent to the defendant's representation of the plaintiff, the defendant participated as a panelist at the New Jersey Institute of Continuing Legal Education (ICLE)[1] in a program entitled "Handling the Catastrophic Injury or Death Case" and in one entitled "How to Try a Medical Malpractice Case." In these programs, defendant stated that attorneys handling medical malpractice cases should always obtain hospital records and use their best efforts to find an expert witness willing to testify on plaintiff's behalf.
Plaintiff alleges that he has no intention of offering the defendant's remarks to establish a standard of care (although defendant's remarks do demonstrate his knowledge of the standard of *522 care), but for purposes of impeachment of the defendant and for use in cross examination of the defendant's expert.
Defendant objects to the plaintiff's using his statements at trial, arguing that it is prejudicial because it is not proper evidence to establish a standard of care; because it is barred by the doctrine of sovereign immunity (Rutgers Law School, being a state entity); and because as a matter of public policy, the defendant's speech is protected speech, i.e.  privileged, and thus, not admissible. Only the last argument, the public policy argument, warrants this court's consideration.
Defendant's brief succinctly sets forth his argument as to why his remarks are privileged and inadmissible.
ICLE relies upon volunteers.... Potential liability for ICLE participation may have the deleterious effect of once enthusiastic lecturers shying away. Having to gauge comments made during the course of a seminar due to a subjective  and possibly objective  fear of being haunted by them later is bound to have a chilling effect which cannot easily be measured.
The amicus curiae makes a similar argument:
A ruling permitting this panelist's statements to be used at trial would stultify the effectiveness of future seminars and quite possibly portend the end of ICLE as we know it today.
The precise question then, is whether an attorney's comments made at a legal seminar is protected speech because it is privileged. This is a question of first impression.
Two privileges are to be considered  communication privileges and constitutional privileges.
The plaintiff's claim of privilege cannot be one based on a confidential communication such as those common law privileges which shield communications between husband and wife or physician and patient, which, along with other such communications, are embodied in the New Jersey statutes (N.J.S.A. 2A:84A-1) and set forth in the Rules of Evidence. (Biunno, current N.J. Rules of Evidence, Rule 500-533). The reason that it is not privileged is because it does not meet the criteria necessary to be a communication privilege. Most judicial commentaries accept the rationale of *523 Dean Wigmore that four fundamental conditions must exist before a privilege against the disclosure of communications may be recognized. Those four conditions are:
(1) The communications must originate in a confidence that they will not be disclosed.
(2) This element of confidentiality must be essential to the full and satisfactory maintenance of the relation between the parties.
(3) The relation must be one which in the opinion of the community ought to be sedulously fostered.
(4) The injury that would inure to the relation by the disclosure of the communications must be greater than the benefit thereby gained for the correct disposal of litigation.
8 Wigmore Evidence Sec. 2285 (McNaughton rev. 1961)
Putting aside the fourth condition, it is clear that defendant's communication does not meet the first three criteria. Therefore, there is no confidential communication privilege which would protect defendant's speech.
What the defendant and the amicus curiae suggest however, is that this case involves a constitutional privilege, namely a privilege rooted in the First Amendment. Defendant argues that a ruling permitting his comments at ICLE to be used against him at trial would in effect have a "chilling effect" on his and other persons' right to free and unfettered speech in these legal seminars. Defendant argues therefore that the use of his comments would violate his First Amendment rights.
There is no doubt that the defendant has a First Amendment right to speak freely at a legal seminar. See Tinker v. Des Moines Community School Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969) ("It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.") 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) Classroom discussions are protected by the First Amendment. Kingsville Independent Sch. Dist. v. Cooper, 611 F.2d 1109 (5th Cir.1980), Minarcini v. Strongsville City School Dist., 541 F.2d 577 (6th Cir.1976). Academic freedom is a special concern of the First Amendment and is *524 entitled to constitutional protection. Sweezy v. State of New Hampshire, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957).
Although this case does not involve a restraint or regulation of speech per se, the defendant is correct, to some extent, in his observation that allowing comments made in an academic setting to be used against the speaker in a court of law, might result in a reluctance of persons to speak freely and openly.
The question, however, is whether, on balance, this result is nevertheless justified. Free speech is not absolute, and, therefore, this court may balance a lecturer's First Amendment rights against social policy considerations, in this case, the public's interest in the full disclosure of the truth in the courtroom. See 16A C.J.S. Constitutional Law Sec. 467: "However, academic freedom, like other constitutional rights is not absolute, and must on occasion be balanced against important competing interests...." See also, (Kingsville Independent Sch. Dist. v. Cooper, supra, discharge of teacher for discussions conducted in the classroom could not be upheld unless the discussions clearly overbalanced her usefulness as a teacher; Tinker v. Des Moines Community School Dist., supra, students' right to wear black arm bands in classroom in protest of the Vietnam War, while protected speech, must be balanced against the disruptive effect of the speech in the classroom setting.)
Professor McCormack recognizes that, although privileges are exclusionary, they are necessary because they protect important social policies.
........
[t]he rules of privilege, ... are not designed or intended to facilitate the fact-finding process or to safeguard its integrity. Their effect instead is clearly inhibitive; rather than facilitating the illumination of truth, they shut out the light.
........
Rules which serve to render accurate ascertainment of the truth more difficult, or in some instances impossible, may seem anomalous in a rational system of fact-finding. Nevertheless, rules of privilege are not without a rationale. Their warrant is the protection of interests and relationships which, rightly or wrongly, *525 are regarded as of sufficient social importance to justify some sacrifice of availability of evidence relevant to the administration of justice.
[McCormack on Evidence, Vol I, Sec. 72, pgs. 268-269.]
Or as the authors in American Jurisprudence put it:
Testimonial privileges contravene the fundamental principals that a public has a right to every persons evidence; as such, they must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominate principals of utilizing all rational means for ascertaining the truth.
[81 Amer.Jur.2d 285 p. 275]
In Dixon v. Rutgers, The State University of N.J., 110 N.J. 432, 541 A.2d 1046 (1988), the New Jersey Supreme Court synopsized these concepts, and noted that, although courts have the power to create new privileges, it should be done with great caution:
... since privileges conceal the truth rather than advancing its ascertainment, courts have traditionally tended to restrict rather than create or expand them. Id. at 446, 541 A.2d 1046.
... [W]here there is no compelling justification for a new privilege, the vital truth seeking function of our justice system must carry the day. quoting from In re Dinnan, 661 F.2d 426, 430, cert. den. sub nom. Dinnan v. Blaubergs 457 U.S. 1106, 102 S.Ct. 2904, 73 L.Ed.2d 1314 (1982), Id. at 447, 541 A.2d 1046.
And our Appellate Division has directly stated that because new privileges involve substantial policy considerations, they should only be created by the Legislature or the Supreme Court.
We determine that the adoption of a privilege restricting the flow of evidence is a substantial policy decision uniquely within the competence of the Supreme Court or the Legislature. Based upon our realization of the limited role of the Appellate Division in such policy matters, we decline to pass upon the merits of the alleged parent-child privilege, reserving such a decision to the Supreme Court should it decide to consider the issue, and to the Legislature., Matter of Gail D., 217 N.J. Super. 226, 232-33, 525 A.2d 337 (App.Div., 1987).
In fact, New Jersey courts have been extremely reluctant to create new privileges or expand on old ones. See for example, CPC Intern. v. Hartford Acc. 262 N.J. Super. 191, 620 A.2d 462 (Law Div. 1992), in which the court granted a discovery motion for corporate documents which had been resisted on the basis of privilege. In doing so, the court made it clear that, although judicially created privileges allow a party to withhold relevant information from discovery, the concept of privilege should not be *526 "lightly created or expansively construed." Id. at 195, 620 A.2d 462. See also University of Pennsylvania v. E.E.O.C., 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990) ("We do not create and apply an evidentiary privilege unless it promotes sufficiently important interests to outweigh the need for probative evidence.") In the area of the first amendment, New Jersey courts have refused to accept the claim of newspaperman privileges to protect a source of information, In re Bridge, 120 N.J. Super. 460, 295 A.2d 3 (App.Div. 1972) cert. denied 410 U.S. 991, 93 S.Ct. 1500, 36 L.Ed.2d 189 (1973), the result of which was the Legislature's creation of The Shield Law, N.J.S.A. 2A:84A-21. See also Matter of Farber, 78 N.J. 259, 394 A.2d 330 (1978) (there is no First Amendment privilege of refusing to reveal relevant confidential information and its sources to grand jury, which is engaged in the fundamental function of fair and effective law enforcement) New York Courts have taken a similar position; See Boikess v. Aspland, 24 N.Y.2d 136, 299 N.Y.S.2d 163, 167, 247 N.E.2d 135, 137-38 (1969) (New York Court of Appeals held that teacher's First Amendment right of academic freedom was not violated by requiring teachers to appear before grand jury in connection with possible drug abuses on university campuses); Herbert v. Lando, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) (in a defamation case, plaintiff is not barred because of any absolute privilege for the editorial processes of a media defendant from inquiring into the editorial processes of those responsible for the alleged defamatory material, where such inquiry will produce evidence material to the proof of a critical element of the plaintiff's case.)
This court has been unable to locate any case law which either addresses or supports the defendant's position, a suggestion perhaps that the issue is not polemic. But when one considers the clear direction that new privileges are only to be created with great caution, and only when there are compelling interests involved, and in this case that academic speech would be, at best, only minimally affected, one must conclude that a new privilege *527 should not be created and that the compelling interests in the truth should prevail.
Motion denied.
NOTES
[1] I.C.L.E. is a non-profit, completely self-supporting organization. It is a joint venture of the New Jersey State Bar Association, Rutgers, The State University of New Jersey, and Seton Hall University. The institute administers the Skills Training Course on behalf of the New Jersey Supreme Court and presents more than 230 seminars each year throughout the State.